

1140 S. Coast Highway 101
Encinitas, CA 92024

Tel  760-942-8505
Fax  760-942-8515
www.coastlawgroup.com

**August 15, 2014**

California Metals                              **VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**
c/o Jerry Turchin
Josh Turchin
297 S. Marshall Ave
El Cajon, CA 92020

**Re:** **Notice of Violation and  Intent to File Clean Water Act Citizens' Suit**
**[33 U.S.C. § 1365] 60-Day Notice**

Dear Mr. Turchin,

Coastal Environmental Rights Foundation ("CERF") sent you an initial 60-day Notice Letter on June 27, 2014. Since that time, additional violations have come to light. Please accept this letter on behalf of CERF regarding such additional violations of the Federal Water Pollution Control Act (Clean Water Act) occurring at the California Metals, Inc facilities located at 297 S. Marshall Avenue, El Cajon, CA 92020 (WDID No. 937I012667) and 636 Front Street, El Cajon, CA 92020 (WDID No. 937I016696). This letter constitutes CERF's second notice of intent to sue for  violations of the Clean Water Act and National Pollution Discharge Elimination System (NPDES) Permit No. CAS000001 (General Industrial Permit).

Section 505(b) of the Clean Water Act requires that sixty (60) days prior to the initiation of a citizen's civil lawsuit in Federal District Court under section 505(a) of the Act, a citizen must give notice of the violations and the intent to sue to the violator and various agency officials. (33 U.S.C. § 1365(b)(1)(A)).

In compliance with section 1365, this letter provides notice of additional California Metals' violations and of CERF's intent to sue.

I.      **BACKGROUND**

        A.      **California Metals Facilities**

California Metals, Inc owns and operates two facilities located at 297 S. Marshall Ave, El Cajon, CA and 636 Front Street, El Cajon, CA. California Metals has been in operation at the S. Marshall Avenue location since 1982 and (per its Storm Water Pollution Prevention Plan) is comprised of three separate operations: (1) a scrap yard which receives scrap metal from various commercial, industrial, and residential sources; (2) a computer surplus house where computers are broken down into parts and re-sold; (3) a new metal supply company.

The California Metals' 297 S. Marshall Street location appears to operate under the names "California Metals Supply," "All Computer Surplus" and "One Earth Recycling," buying, selling and recycling metals including aluminum, copper, brass, and nickel. The 636 Front Street location appears to operate under the name "Miller Metals Co." The facilities operating at both locations are collectively referred to herein as "California Metals facilities." CERF is

informed and believes the California Metals facilities operate in conjunction and transfer materials between the two locations and various facilities.

California Metals, Inc owns or owned the fictitious business names: California Metals, Miller Industrial Metals, California Metal Supply, All Computer Surplus, One Earth Recycling, and Miller Metals. Jerry Turchin is the registered agent for California Metals, Inc, the registered owners of the fictitious businesses "California Metals" at 297 S. Marshall Ave and 636 Front Street in El Cajon, Miller Metals, and One Earth Recycling. Josh Turchin is the registered agent for One Earth Recycling, Inc, which owns the fictitious business names One Earth Recycling Inc and Green Earth Recycling Inc. The owners and operators of all aforementioned facilities operating at both 297 S. Marshall Ave and 636 Front Street are collectively referred to herein as the "California Metals Owners and/or Operators."

### B.    Storm Water Pollution From Industrial Facilities

Storm water pollution results from materials and chemicals washed into the storm drains from streets, gutters, neighborhoods, industrial sites, parking lots and construction sites. This type of pollution is significant because storm water is often untreated and flows directly to receiving waters, including lakes, rivers, or ultimately the ocean. Storm water runoff associated with industrial facilities in particular has the potential to negatively impact receiving waters and contributes to the impairment of downstream waterbodies. Industrial areas are known to result in excessive wet-weather storm water discharges, as well as contaminated dry weather entries into the storm drain system.[1] "The bulk size of the recyclable waste materials and the processing equipment associated with these facilities frequently necessitates stockpiling materials and equipment outdoors. Consequently, there is significant opportunity for exposure of storm water runoff to pollutants." (Fed.Reg. Vol. 60, No. 189, p. 50953). Potential pollutants exposed to storm water at scrap and waste recycling facilities include, but are not limited to: oil and grease; metals including magnesium, aluminum, cadmium, zinc, steel or iron, cast iron, chromium, tin, lead, nickel, soft and silver solder, copper, stainless steel, silver, gold, platinum, brass and bronze; lead acid; hydraulic fluids and other lubricants. (*Id.* at pp. 50953-50956).

### C.    Lake Murray, San Diego River, Pacific Ocean

Lake Murray is on the 303(d) list as impaired for pH and Nitrogen. San Diego River's lower reach is listed for enterococcus, fecal coliform, low dissolved oxygen, manganese, nitrogen, phosphorus, total dissolved solids, and toxicity. The Pacific Ocean shoreline at the San Diego River outlet is listed for enterococcus and total coliform.

Discharges from both California Metals facilities flow downstream into the San Diego River, which is impaired for total dissolved solids. Dissolved solids include any minerals, salts, and metals dissolved in water. Therefore, discharges from these facilities contribute to the impairment of San Diego River and exacerbate such impairment.

---

[1] *Illicit Discharge Detection and Elimination: Technical Appendices*, Appendix K, Specific Considerations for Industrial Sources of Inappropriate Pollutant Entries to the Storm Drainage System (Adapted from Pitt, 2001)

### D.   Discharges From California Metals Facilities

The 297 S. Marshall Ave California Metals facility has been enrolled under the General Industrial Permit since November 22, 1996. The 636 Front Street California Metals facility has been enrolled since August 7, 2001. According to the 297 S. Marshall Ave facility Storm Water Pollution Prevention Plan (SWPPP), storm water runoff flows to the southeast corner of the property, then flows east and discharges to the municipal storm drain system on "Miller [sic] Avenue." The 636 Front Street facility drains toward the driveway and then into the storm sewer system along Front Street.

### E.   Coastal Environmental Rights Foundation

CERF is a California nonprofit public benefit corporation founded by surfers dedicated to the protection, preservation and enhancement of the environment, wildlife, natural resources, local marine waters and other coastal natural resources. CERF's interest are and will be adversely affected by California Metals Owners and/or Operators' actions. CERF's mailing address is 1140 S. Coast Highway 101, Encinitas, CA 92024.  Its telephone number is (760) 942-8505.

Members of CERF use and enjoy the waters into which pollutants from California Metals facilities' ongoing illegal activities are discharged, including Lake Murray, the San Diego River, and the Pacific Ocean. The public and members of CERF use these receiving waters to fish, sail, boat, kayak, surf, swim, scuba dive, birdwatch, view wildlife, and to engage in scientific studies. The discharge of pollutants by the California Metals facilities affects and impairs each of these uses. Thus, the interests of CERF's members have been, are being, and will continue to be adversely affected by California Metals Owners and/or Operators' failure to comply with the Clean Water Act and the General Industrial Permit.

## II.   CLEAN WATER ACT VIOLATIONS

The Clean Water Act (CWA) was amended in 1972 to provide that the discharge of pollutants to waters of the United States from any point source is effectively prohibited unless the discharge is in compliance with an NPDES permit. The 1987 amendments to the CWA added Section 402(p) that establishes a framework for regulating municipal and industrial storm water discharges under the NPDES Program. In 1990, US EPA published final regulations that require storm water associated with industrial activity that discharges either directly to surface waters or indirectly through municipal separate storm sewers be regulated by an NPDES permit. Any person who discharges storm water associated with industrial activities must comply with the terms of the General Industrial Permit in order to lawfully discharge pollutants. (33 U.S.C. §§1311(a), 1342; 40 CFR §126(c)(1); General Industrial Permit Fact Sheet, p. vii ["All facility operators filing an NOI after the adoption of this General Permit must comply with this General Permit."]).

As enrollees under the General Industrial Permit, the California Metals facilities have failed and continue to fail to comply with the General Industrial Permit, as detailed below. Failure to comply with the General Industrial Permit is a Clean Water Act violation. (General Industrial Permit, §C.1).

**Notice of Intent to Sue: Clean Water Act**
*California Metals*
**August 15, 2014**
**Page 4**

A.    **The California Metals Facilities Discharge Contaminated Storm Water in Violation of the General Industrial Permit**

Discharge Prohibition A(2) of the General Industrial Permit prohibits storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges to surface or groundwater that adversely impact human health or the environment. In addition, receiving Water Limitation C(2) prohibits storm water discharges and authorized non-storm water discharges, which cause or contribute to an exceedance of any water quality standards, such as the CTR or applicable Basin Plan water quality standards. "The California Toxics Rule ("CTR"), 40 C.F.R. 131.38, is an applicable water quality standard." (*Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 926). "In sum, the CTR is a water quality standard in the General Permit, Receiving Water Limitation C(2). A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' such a standard, including the CTR." (*Id.* at 927).

If a discharger violates Water Quality Standards, the General Industrial Permit and the Clean Water Act require that the discharger implement more stringent controls necessary to meet such Water Quality Standards.(General Industrial Permit, Fact Sheet p. viii; 33 U.S.C. § 1311(b)(I)(C)). The California Metals Owners and/or Operators have failed to comply with this requirement, routinely violating Water Quality Standards without implementing BMPs to achieve BAT/BCT or revising their SWPPPs pursuant to section (C)(3).

As demonstrated by sample data submitted by California Metals, California Metals Owners and/or Operators have discharged and continue to discharge storm water containing pollutants at levels in violation of the above listed prohibitions and limitations during every significant rain event. California Metals facilities' sampling data reflects 12 discharge violations. California Metals' own sampling data is not subject to impeachment. (*Baykeeper, supra*, 619 F.Supp. 2d at 927, citing *Sierra Club v. Union Oil Co. of Cal.*, (9th Cir. 1987) 813 F.2d 1480, 1492 ["when a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error"]).

This data once again demonstrates the California Metals facilities continuously discharge contaminated storm water during rain events which have not been sampled.

**Notice of Intent to Sue: Clean Water Act**
*California Metals*
**August 15, 2014**
**Page 5**

| Annual Sampling Data 636 Front Street Location | | | Applicable CTR Limit (mg/L) | |
|---|---|---|---|---|
| Date/time of sample collection | Parameter | Result (mg/L) | Maximum Conc. | Continuous Conc. |
| 12/19/2013 | Copper | .200 | 0.013 | 0.009 |
| 12/19/2013 | Lead | .073 | 0.013 | 0.009 |
| 12/19/2013 | Zinc | .370 | 0.12 | 0.12 |

| Annual Sampling Data 297 S. Marshall Street Location | | | Applicable CTR Limit (mg/L) | |
|---|---|---|---|---|
| Date/time of sample collection | Parameter | Result (mg/L) | Maximum Conc. | Continuous Conc. |
| 2/28/2014 | Copper | .520 | 0.013 | 0.009 |
| 2/28/2014 | Lead  Total | .140 | 0.065 | 0.0025 |
| 2/28/2014 | Zinc | 1.5 | 0.12 | 0.12 |

In addition, the sampling data reveals numerous exceedances of the Basin Plan Water Quality Objectives for the San Diego Hydrologic Unit at both locations.

| Annual Sampling Data 636 Front Street Location | | | |
|---|---|---|---|
| Date/time of sample collection | Parameter | Result (mg/L) | Basin Plan WQO (mg/L) |
| 12/19/2013 | Iron | .610 | .3 |

| Annual Sampling Data 297 S. Marshall Street Location | | | |
|---|---|---|---|
| Date/time of sample collection | Parameter | Result (mg/L) | Basin Plan WQO (mg/L) |
| 2/28/2014 | Iron | 7.4 | .3 |
| 2/28/2014 | pH | 3.0 | Not < 6.5 or > 8.5 |

Every day the California Metals Owners and/or Operators discharged or continue to discharge polluted storm water in violation of the Discharge Prohibitions and Receiving Water Limitations of the General Industrial Permit is a separate and distinct violation of the Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).The California Metals Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring

since August 15, 2009. These violations are ongoing and the California Metals Owners and/or Operators' violations will continue each day contaminated storm water is discharged in violation of the requirements of the General Industrial Permit. CERF will include additional violations when information becomes available.

### B. Failure to Develop and/or Implement BMPs that Achieve Compliance with Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology

Effluent Limitation (B)(3) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through implementation of the Best Available Technology Economically Achievable (BAT) for toxic pollutants[2] and Best Conventional Pollutant Control Technology (BCT) for conventional pollutants.[3]

EPA Benchmarks are the pollutant concentrations which indicate whether a facility has successfully developed or implemented BMPs that meet the BAT/BCT. For scrap metal yards (SIC 5093), the EPA has instituted the following benchmarks[4]:

| Parameter | Benchmark Monitoring Cutoff Concentration (mg/L) |
|---|---|
| Total Suspended Solids (TSS) | 100 |
| Total Recoverable Aluminum | .75 |
| Total Recoverable Copper | .0636 |
| Total Recoverable Iron | 1.0 |
| Total Recoverable Lead | .0816 |
| Total Recoverable Zinc | .117 |

Discharges with pollutant concentration levels above EPA Benchmarks and/or the CTR demonstrate that a facility has failed to develop and/or implement BMPs that achieve compliance with BAT for toxic pollutants and BCT for conventional pollutants. The California Metals facilities annual reports demonstrate consistent exceedances of not only the CTR, but also EPA benchmarks at both locations.

---

[2] Toxic pollutants are found at 40 CFR § 401.15 and include, but are not limited to: lead, nickel, zinc, silver, selenium, copper, and chromium.

[3] Conventional pollutants are listed at 40 CFR  § 401.16 and include biological oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

[4] Storm Water Multi-Sector General Permit for Industrial Activities, 65 Fed. Reg. 64839, Table N-1

**Notice of Intent to Sue: Clean Water Act**
*California Metals*
**August 15, 2014**
**Page 7**

| Annual Sampling Data 297 S. Marshall Street Location | | | |
|---|---|---|---|
| Date/time of sample collection | Parameter | Result (mg/L) | EPA Benchmark (mg/L) |
| 2/28/2014 | Iron | 7.4 | 1 |
| 2/28/2014 | Aluminum  Total | 5.3 | 0.75 |
| 2/28/2014 | Total Suspended Solids (TSS) | 230 | 100 |

Thus, California Metals Owners and/or Operators' storm water discharge sampling data demonstrates that the California Metals Owners and/or Operators have still not developed and/or implemented BMPs that meet the standards of BAT/BCT. (See *Baykeeper, supra*, 619 F.Supp. 2d at 925 ["Repeated and/or significant exceedances of the Benchmark limitations should be relevant" to the determination of meeting BAT/BCT]).

As noted in CERF's June 27, 2014 60-day Notice Letter, observations and photographs of the California Metals Facilities confirm these violations. (See Exhibits A and B to June 27, 2014 60-day Notice Letter). As with prior Annual Reports, the 2013-14 reports again reflect "slight oil sheen" onsite. (See 2097 S. Marshall Annual Report, Form 4, 2/28/2014 observations; 636 Front Street Annual Report, Form 4, 12/19/2013).[5]

These repeated failures have resulted and continue to result in and contribute to the degradation of receiving waters, including the San Diego River and Lake Murray.

Thus, the California Metals Owners and/or Operators are seriously in violation of Effluent Limitation (B)(3) of the Storm Water Permit. Every day the California Metals Owners and/or Operators operate with inadequately developed and/or implemented BMPs in violation of the BAT/BCT requirements in the General Industrial Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act. (33 U.S.C. § 1311 (a)). The California Metals Owners and/or Operators have been in daily and continuous violation of the BAT/BCT requirements of the General Industrial Permit every day since at least June 27, 2009. These violations are ongoing and the California Metals Owners and/or Operators will continue to be in violation every day they fail to develop and/or implement BMPs that achieve BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges at the California Metals facilities. The California Metals Owners and/or Operators are subject to penalties for all violations of the General Industrial Permit and the Clean Water Act occurring since at least August 15, 2009 Thus, the California Metals Owners and/or Operators are liable for civil penalties for numerous violations of the General Industrial Permit and the Clean Water Act.

---

[5] Though there is an additional entry for observation date 2/28/2014 for 636 Front Street, this appears to be an improper copy of the 297 S. Marshall entry.

**Notice of Intent to Sue: Clean Water Act**
*California Metals*
**August 15, 2014**
**Page 8**

C.      **Failure to Develop and/or Implement an Adequate Storm Water Pollution Prevention Plan at the 636 Front Street Facility**

Section A(1) and Provision E(2) of the General Industrial Permit require dischargers to have developed and implemented a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all of the requirements of the Storm Water Permit. The objective behind the SWPPP requirements is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the California Metals Facilities, and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. (General Industrial Permit, Section A(2)). To ensure its effectiveness, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A(9), and must be revised as necessary to ensure compliance with the Permit. (General Industrial Permit, Section A(9), (10)).

In addition, section A(3) - A(10) of the General Industrial Permit sets forth the requirements for a SWPPP, including but not limited to: a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); and, a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources and a description of locations where soil erosion may occur (Section A(6)). Sections A(7) and (8) require an assessment of potential pollutant sources at the facility and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective.

California Metals Owners and/or Operators have not complied with sections A(3)-A(10) detailed above for the 636 Front Street Facility by failing to: (1) include a narrative of potential pollutant sources associated with its activities and potential pollutants that could be discharged; and (2) a narrative assessment of which areas are likely source of pollutants and which pollutants are likely to be present in storm water discharges. California Metals' 636 Front Street Facility (just as the 297 S. Marshall Facility) SWPPP "Assessment of Potential Pollution Source and Materials" section is woefully inadequate in this regard. The SWPPP does not identify potential pollutants, even those that routinely show up in its own testing:

Metals identified by the EPA as concerns for scrap metal recycling facilities or, at the very least, those that show up in Kramer's own testing of the facility, would be appropriate to list. Without a reasonably specific identification of potential pollutants, the identification of BMPs may be rendered meaningless in that it will be more difficult to assess whether they are effective. (*Baykeeper*, *supra*, 619 F.Supp. 2d at 930.)

In addition, the site map does not include the necessary components pursuant to General Industrial Permit section A.4. The location of the storm water collection and conveyance is not identified, nor are any structural control measures included. As conceded in the SWPPP and further corroborated by facility photographs, materials are directly exposed to precipitation onsite. (SWPPP, §III, p. 3). However, these locations are not identified on the site

map. (General Industrial Permit §A.4.d). Aerial and site visit photographs also confirm the site map does not include all locations of storage areas, shipping and receiving and fueling areas, vehicle equipment/maintenance areas, material and handling areas, dust or particulate generating areas, waste treatment areas, cleaning and rinsing areas, and other areas of industrial activity which are potential pollutant sources. (*Id.* at §A.4.e). Further, the SWPPP fails to adequately describe the quantity or type of materials processed and stored at the facility or the storage procedures.

CERF investigators' observations of the conditions at the California Metals Facilities and sampling of storm water discharges from the California Metals Facilities, which are set forth in detail in the June 27, 2014 Notice Letter, indicate that the California Metals Owners and/or Operators have not developed or implemented an adequate SWPPP at the 636 Front Street Facility that meets the requirements of Section A of the General Industrial Permit.

Further, both California Metals Facilities' SWPPPs appear to be mere copies of plans prepared for another location. The 636 Front Street location and 297 S. Marshall location SWPPPs both contain Engineering Plan Certifications for "the American Racing Equipment facility located [sic] 19200 S. Reyes Ave., Rancho Dominguez, CA 90221..." (SWPPP, p. I-5). This further reflects the California Metals Owners and/or Operators' failure to prepare a site-specific SWPPP, and the inadequacy of the SWPPPs for the Facilities.

Every day the California Metals Owners and/or Operators operate the California Metals facilities with an inadequately developed and/or implemented SWPPP is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act. (33 U.S.C. § 1311(a)). The California Metals Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit's SWPPP requirements every day since at least August 15, 2009. These violations are ongoing and the California Metals Owners and/or Operators will continue to be in violation every day they fail to revise, develop, and/or implement an adequate SWPPP for the California Metals Facilities.

The California Metals Owners and/or Operators are thus subject to penalties for all SWPPP-related violations of the General Industrial Permit and the Clean Water Act occurring since at least August 15, 2009.Thus, the California Metals Owners and/or Operators are liable for civil penalties for 1825 violations of the General Industrial Permit and the Act.

### D.      Falsification of Reports

Section B(14) requires that all facility operators shall submit an Annual Report by July 1 of each year to the Executive Officer of the Regional Water Board responsible for the area in which the facility is located. For the 2013-2014 reporting period, California Metals Owners and/or Operators submitted a report for each Facility. For the 636 Front Street location, the California Metals Owners and/or Operators certified that they sampled two storm events (Annual Report, p. 2). This is false.

The 2013-14 Annual Report Form 1 for the 636 Front St location indicates samples were taken on 12-19-2013 at 4:15 PM by Ricardo Pinzon, the Foreman and on 2/28/2014 at 10:00 AM by Phyllis Lyle, the Office Manager. The 2013-14 Annual Report Form 1 for the 297 S. Marshall location indicates samples were taken on 2/28/2014 at 10:00 AM by Phyllis

**Notice of Intent to Sue: Clean Water Act**
*California Metals*
August 15, 2014
Page 10

Lyle, the Office Manager. <u>Thus, according to these reports, Phyllis Lyle took samples at both locations at the exact same time</u>. <u>Indeed, the results of the sampling were exactly the same</u>. The 297 S. Marshall location Laboratory Report from Babcock Laboratories, Inc indicates the 2/28/2014 sample (sampled by Phyllis Lyle) was given a Laboratory Reference Number of B4C0162-01. The chain of custody for this sample indicates the location was: Marshall - El Cajon.

The Laboratory Report submitted for the 636 Front Street location contains the chain of custody for the 12/19/2013 sampling event – but indicates the project location was also Marshall - El Cajon. This Laboratory Report also contains the sampling data and chain of custody – Laboratory Reference Number B4C0162-01 – that was submitted for the 297 S. Marshall location.

Thus, the second sampling event for the 636 Front Street location was actually for the 297 S. Marshall location. Indeed, both sampling events may have been for the 297 S. Marshall location. <u>What is clear, however, is that Phyllis Lyle did not take the exact same sample at the exact same time at both locations – samples which yielded the exact same lab results. One of the Annual Reports is incorrect</u>.[6]

In addition, for the 297 S. Marshall Ave location, the California Metals Owners and/or Operators certified that they analyzed the Table D parameters for SIC Code 5093 (Annual Report, p. 3). Though the Laboratory Report for this location indicates copper was tested, the Form 1 for the Annual Report does not include this parameter. Further, the Form 1 does indicate Oil and Grease was tested but came back as "0 mg/L", the Laboratory Report indicates Oil and Grease was never tested. The General Industrial Permit section B.5.c. requires sample analysis for either total organic carbon or oil and grease. Neither were analyzed.

Lastly, the 2013-14 Annual Reports for both Facilities contain false sampling results. Because the 2/28/2014 sampling event was reported on the Form 1 for both Facilities, both contain the same inaccurate information. All results for copper, lead, zinc, iron, and aluminum are reported in mg/L. The Laboratory Reports, however, provide the results for these parameters in ug/L. One thousand mircograms are equal to one milligram. The Form 1 results for both Facilities for copper, lead, zinc, iron, and aluminum are off by a factor of ten.

Every day the California Metals Owners and/or Operators fail to submit an accurate Annual Report for the California Metals Facilities is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act. (33 U.S.C. § 1311(a)). The California Metals Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit's reporting requirements every day since at least July 1, 2014. These violations are ongoing and the California Metals Owners and/or Operators will continue to be in violation every day they fail to revise and submit accurate 2013-14 Annual Reports. Thus, the California Metals Owners and/or Operators are liable for civil penalties for an additional 92

---

[6] In previous Annual Reports for the 297 Marshall location, Phyllis Lyle was identified as the Office Manager and as the sample collector.

violations of the General Industrial Permit and the Act.

Further, both the General Industrial Permit and the Clean Water Act make it unlawful to falsify reports, punishable by a $10,000 fine or by imprisonment, or both. (General Industrial Permit, Section C.19; 33 U.S.C. §1319(c)(4)). In addition to knowing falsification, negligent violation of the Clean Water Act is also punishable through criminal penalties. (33 U.S.C. §1319(c)(1)).

## E.   Failure to Monitor

The California Metals Owners and/or Operators have further failed to sample two storm events as required for the 2013-2014 year. Sections B(5) and (7) of the General Industrial Permit require dischargers to visually observe and collect samples of storm water discharged from all locations where storm water is discharged. Facility operators, including California Metals Owners and/or Operators, are required to collect samples from at least two qualifying storm events each wet season, including one set of samples during the first storm event of the wet season. Required samples must be collected by Facility operators from all discharge points and during the first hour of the storm water discharge from the Facility.

As detailed above, though the Annual Report for the 636 Front Street indicates samples were taken on two occasions, neither the associated Laboratory Report nor the 297 S. Marshall Avenue Annual Report corroborate this assertion. It appears the 2/28/2014 sampling was done at the Marshall location. Thus, for each location, only one rain event was sampled.

Because California Metals Owners and/or Operators failed to obtain two samples as required for the 2013-2014 period, they are subject to penalties in accordance with the General Industrial Permit – punishable by a minimum of $37,500 per day of violation. (33 U.S.C. §1319(d); 40 CFR 19.4).

## III.   REMEDIES

CERF's action will seek all remedies available under the Clean Water Act. (33 U.S.C. § 1365(a)(d)). "In suits under Section 505 of the Clean Water Act, citizens have access to the same remedies available to the EPA." *(Student Public Interest Research Group, Inc. v. Georgia-Pacific Corp.*, 615 F. Supp. 1419, 1425 (D.N.J. 1985), citing *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13-14 (1981)). Pursuant to Section 309(d) of the Clean Water Act and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day for all violations occurring during the period commencing five years prior to the date upon which this notice is served.

In addition to civil penalties, CERF will seek injunctive relief preventing further violations of the Clean Water Act pursuant to sections 505(a) and (d), declaratory relief, and such other relief as permitted by law. Section 505(d) of the Clean Water Act permits prevailing parties to recover costs, including attorneys' and experts' fees. CERF will seek to recover all of its costs and fees pursuant to section 505(d).

**Notice of Intent to Sue: Clean Water Act**
*California Metals*
**August 15, 2014**
**Page 12**

CERF has retained legal counsel to represent them in this matter.  All communications should be addressed to:

> **Marco A. Gonzalez**
> **COAST LAW GROUP LLP**
> **1140 S. Coast Highway 101**
> **Encinitas, CA 92024**
> **Tel: (760) 942-8505 x 102**
> **Fax: (760) 942-8515**
> **Email: marco@coastlawgroup.com**

Upon expiration of the 60-day notice period, CERF will file a citizen suit under Section 505(a) of the Clean Water Act for the above-referenced prior, continuing, and anticipated violations. During the 60-day notice period, however, CERF will entertain settlement discussions. If you wish to pursue such discussions in the absence of litigation, please contact Coast Law Group LLP immediately.

Sincerely,

**COAST LAW GROUP LLP**

**Marco A. Gonzalez**

**Livia Borak**
Attorneys for
Coastal Environmental Rights Foundation

CC:

| | |
|---|---|
| Jared Blumenfeld, Region 9 Administrator<br>Alexis Strauss, Deputy Regional Administrator<br>U.S. EPA, Region 9<br>75 Hawthorne Street<br>San Francisco, CA, 94105 | Dave Gibson, Executive Officer<br>Catherine Hagan, Staff Counsel<br>San Diego Regional Water Quality Control Board<br>9174 Sky Park Court, Suite 100<br>San Diego, CA. 92123-4340 |
| Gina McCarthy<br>EPA Administrator<br>Mail Code 4101M<br>USEP A Ariel Rios Building (AR)<br>1200 Pennsylvania Avenue N.W.<br>Washington, DC 20004 | Thomas Howard<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, CA 95812–0110 |